O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 08-00344 DDP |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING MOTION TO SUPPRESS** |
| | ) | |
| v. | ) | [Motion filed on January 16, |
| | ) | 2009] |
| ROSS CHARLES HACK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | | |

Defendant Ross Hack ("Hack") is charged in a one-count indictment with knowingly and willfully making a false statement on a passport application with the intent to induce its issuance in violation of 18 U.S.C. § 1542. Hack moves to suppress the passport applications that form the basis of this indictment. Hack argues that his replacement passport was illegally seized on February 7, 2008, and that federal officers only discovered the 1998 passport application documents as a result of that illegal seizure. Accordingly, Hack argues, the 1998 passport application documents are the tainted fruit of an illegal seizure, and must be suppressed. After reviewing the arguments and evidence submitted

1 | by the parties and holding an evidentiary hearing, the Court denies
2 | Hack's Motion.

3 | **I.    BACKGROUND**

4 |     **A.    Indictment and Allegations in This Case**

5 |     On July 30, 1998, police investigating Hack's involvement in a
6 | double-homicide executed a warrant on Hack's Las Vegas, Nevada
7 | home; in connection with that search, police seized Hack's
8 | passport.  On or about August 5, 1998, Hack went in person to the
9 | U.S. Passport Office in Los Angeles, California and executed a
10 | "Will Call" application for a passport (also known as a DSP-11
11 | form).  The Will Call process allows an applicant who reports in
12 | person to the U.S. Passport Office to obtain a passport on the same
13 | day that he submits his application.  Hack also submitted a DSP-64,
14 | Statement Regarding Lost or Stolen Passport, dated August 5, 1998.
15 | In the DSP-64, Hack stated that he did not know how his passport
16 | was lost or stolen, but that he had last seen his passport about
17 | one week prior and discovered the loss on July 30, 1998.  Hack was
18 | issued a Will Call passport, and traveled to Europe soon
19 | thereafter.

20 |     On March 12, 2008, the United States filed a criminal
21 | complaint against Hack, charging him with one count of making a
22 | false statement in an application for a passport, 18 U.S.C. § 1542.
23 | Complaint, Docket Entry No. 1 (March 12, 2008).  The grand jury
24 | indicted Hack on March 21, 2008.  Indictment, Docket Entry No. 11
25 | (March 21, 2008).

26 |     **B.    Facts Underlying This Motion**

27 |     Hack's argument for suppression fundamentally depends on the
28 | sequence of events in the federal investigation of the charges at

issue here.  There are two critical factual issues: (1) whether

Hack's passport seized during the February 7, 2008 parole search

for Melissa Hack and (2) whether the government discovered the 1998

passport application documents prior to the parole search.  The

Court discusses the evidence on each of these issues below.[1]

1.  <u>February 7, 2008 Parole Search of Melissa Hack</u>

On or about February 7, 2008, Melissa Hack, Defendant's

sister, was detained by the Las Vegas Metropolitan Police

Department officer and transported to the Investigative Services

Division for an interview.  Kelly Decl. ¶ 4.  Melissa Hack was on

parole.  Deuel Decl. ¶ 4.  Among the conditions of her parole were

prohibitions on drinking alcohol, entering any bar or lounge for

any purpose except employment, contact or association with gang

members, and possession of gang paraphernalia.  Opp., Ex. B;

Merrick Decl. ¶ 4.  Law enforcement officers interrogated her

regarding a bar fight that allegedly occurred on January 26, 2008

at a white supremacist concert dubbed "Unity Fest."  Law

enforcement believed that concert was coordinated by Ross and

Melissa Hack.  Kelly Decl. ¶ 6.  After Melissa Hack's

---

[1]The evidence before the Court consists of the following: (1) declarations from Ross Hack, Jane Hack, David Deuel, James Fink, Keith Kelly, Doug Manookian, Fred Merrick, Matthew Sanford, and John Young; (2) live testimony from Ross Hack, Keith Kelly, Fred Merrick, John Young, Paul Montuori, and Kelly Partin; (3) transcripts of two recorded phone voice messages left by Hack on Paul Montuori's cell phone (Government Exhibit 2) ("Call 1" or "Call 2"); (4) a sworn statement given by Ross Hack at the DSS office on March 12, 2008 (Government Exhibit 3) ("Hack Statement"); and (5) exhibits on file to which there has been no objection.

1   interrogation, officers conducted a parole search of the Las Vegas

2   residence.  Merrick Decl. ¶ 4.[2]

3       Hack testified that, when officers arrived at the Hack

4   residence on February 7, 2008, Hack answered the door.  Although

5   the officers did not identify themselves, Hack saw his sister in

6   handcuffs and understood that they were there to conduct a parole

7   search because his sister had violated her parole.  Two officers

8   accompanied Hack upstairs to his bedroom to retrieve his shoes and

9   a shirt, and spoke to him outside the house during the search.

10  Hack testified that those officers stood at the edge of the room,

11  but did not enter it.  See also Merrick Decl. ¶ 7; Sanford Decl.

12  ¶¶ 5, 7.

13      There is some dispute as to how the search proceeded.

14  According to Jane Hack, Defendant's mother, search team members

15  entered and exited Ross Hack's bedroom "multiple times."  J. Hack

16  Decl. ¶ 6.  According to the Defendant, who was not inside the

17  residence while the search was being conducted, his replacement

18  passport was in his bedroom prior to the search and was not there

19  afterward.  R. Hack Decl. ¶ 4.  The Defendant did not testify to

20  the location of the passport in his declaration, except to say that

21  it was in his bedroom.  Id.  In the sworn statement he gave on

22  March 12, 2008, Hack stated that he kept his passport either on his

23  desk or in the drawer of his night stand next to his bed, where he

24

_____

25      [2]According to the declaration of Jane Hack, there were
    approximately six to eight officers and agents who conducted the
26  search, and only two identified themselves as Las Vegas
    Parole/Probation Department officers.  J. Hack Decl. ¶ 3; M. Hack
27  Decl. ¶¶ 8-9.  According to the Government, no federal agents were
    involved in the search.  Fink Decl. ¶ 3; Merrick Decl. ¶ 5; Kelly
28  Decl. ¶ 11.

kept "all of [his] important identification as well as [his] wallet, car keys, and telephone." Hack Statement at 1. The record contains different indications as to when Hack discovered that his passport was missing. In his declaration, Hack testified that he discovered that his passport was missing on February 7, 2008, "[a]fter the search was completed and the officer/agents had left." Hack Decl. ¶ 4. According to his March 12 statement, Hack indicated that he first discovered his passport was missing on that day. Hack Statement at 1. In his live testimony, Hack stated that he had formed the belief that the police took his passport prior to March 12, 2008.

The officers present at the search deny that they searched Defendant's room for his passport. David Deuel, Melissa Hack's parole officer, did not observe anyone search any room besides Melissa Hack's room and the adjacent bathroom. Deuel Decl. ¶ 5. LVMPD Detective James Fink and Parole and Probation Sergeant Doug Manookian did not physically enter Hack's room and did not observe anyone else enter his room. Fink Decl. ¶ 8; Manookian Decl. ¶ 4. LVMPD Detective Fred Merrick escorted Hack to his room to obtain his sandals and ensure he did not retrieve a weapon before accompanying him outside while other officers performed the search. Merrick Decl. ¶ 7; see Sanford Decl. ¶¶ 5, 7. According to Merrick, he neither searched Defendant's room nor observed a passport in Defendant's room. Merrick Decl. ¶ 7; see Sanford Decl. ¶ 5, 7. FBI Agent Kelly and DSS Agent Young asserted in their declarations, and DSS Agent Partin asserted during the evidentiary hearing, that they were never told that any member of law

5

1  enforcement seized Hack's passport during the parole search.  Kelly

2  Decl., ¶ 12; Young Decl. ¶ 14.

3              2.   Federal Investigation into Defendant

4       According to the Government, prior to the parole search at the

5  Las Vegas residence, it was investigating the involvement of both

6  Ross and Melissa Hack in the January 26, 2008 Unity Fest assault.

7  Kelly Decl. ¶¶ 6-9.  FBI Special Agent Keith Kelly and United

8  States Department of State Diplomatic Security Service ("DSS")[3]

9  Special Agent John Young worked together on the Joint Terrorism

10 Task Force ("JTTF").  According to Kelly, in the course of his

11 investigations as a member of the Domestic Terrorism Section of the

12 JTTF, he learned that the violence of the Hammerskin Nation, a neo-

13 Nazi skinhead gang, had been on the rise in Las Vegas throughout

14 2007.  Kelly Decl. ¶¶ 3-4.  As part of his investigation into the

15 activities of the Hammerskin Nation, he learned that Ross Hack was

16 a prominent member of the Las Vegas chapter.  Id. ¶ 5.  He further

17 learned that, in 1998, while Hack was considered a suspect in a

18 double-homicide, he traveled to Europe, despite the fact that LVMPD

19 had seized his passport.  Id.  Kelly testified that he first

20 learned of Hack at some point in 2007, but believed Hack was out of

21 the country until January 2008 and had not investigated Hack's

22 passport until that time.  Kelly's declaration does not make clear

23 when Kelly learned of the search and seizure regarding the 1998

24 investigation.  See Kelly Decl. ¶ 5.  In oral testimony, however,

25 Kelly clarified that he did not learn about the 1998 search and

26 seizure until after the Unity Fest incident.

27

28      [3]DSS is the federal law enforcement agency charged with
   investigating passport-related fraud.

1   On February 1, 2008, while investigating the Unity Fest
2   assault, Kelly testified that he met with LVMPD detectives from the
3   violent Crimes Unit and the Gang Unit, which participated in
4   surveillance of Unity Fest.  Id. ¶ 7.  At that meeting, Kelly
5   learned that Defendant was surveilled assisting the attacker in
6   leaving the area after the Unity Fest assault.  Id.  Kelly's
7   earlier investigation led him to believe that Melissa Hack was an
8   organizer for Unity Fest.  Id. ¶ 6.  On February 6, 2008, Kelly
9   attended another meeting with LVMPD detectives as well as Parole
10  and Probation, where investigators discussed executing a parole
11  search on Melissa Hack.  Id. ¶ 8.

12      Kelly testified that, on the morning of February 7, 2008, he
13  contacted DSS Agent Young and requested a records check on the date
14  that Hack returned the United States.  Id. ¶ 9; Young Decl. ¶¶ 5-7;
15  see Compl., Partin Aff. ¶ 3; Mot., Ex. 4 at 8:13-17.  Young is the
16  DSS agent on the JTTF.  According to Kelly and Young, the 1998
17  passport filing was discovered during that check and related
18  discussion.  Kelly Decl. ¶ 9; Young Decl. ¶¶ 5-7; Compl., Partin
19  Aff. ¶¶ 5-6.  According to Agent Young, the last time he saved the
20  passport application file was 9:36 a.m. on Thursday, February 7,
21  2008.  Young Decl. ¶ 9.  Young testified at the evidentiary hearing
22  that he did not remember hearing of Ross Hack until he was asked to
23  look at when Hack returned to the United States.

24      Kelly testified in his declaration that, knowing that a parole
25  search was scheduled for later that day, he informed LVMPD
26  Detective Merrick that he believed Hack had committed passport
27  fraud.  Kelly Decl. ¶ 10.  He also testified that he contacted the
28  United States Attorney's Office in Las Vegas to seek authorization

1  to make a probable cause arrest of the defendant on that day, but

2  the U.S. Attorney did not authorize an arrest on that day.  Id.

3     During the evidentiary hearing, Young testified that, between

4  February 7 and March 10, he had several conversations with the U.S.

5  Attorney's office in Las Vegas about the prosecution of Hack for

6  the 1998 application.  Young testified that, between February 7 and

7  March 10, he and the AUSA were investigating the potential grounds

8  for which they could bring charges against Hack for passport fraud

9  under § 1542 and related sections.  Young testified that the U.S.

10  Attorney in Las Vegas had requested that Young interview Mandie

11  Abels, who was present in 1998 when the Las Vegas police seized

12  Hack's passport.  At least one of the other crimes, Young

13  testified, would require pulling in people from overseas.  Because

14  they thought Hack might be leaving soon, Young and the U.S.

15  Attorney thought that § 1542 was the easiest prosecution to bring,

16  and decided to go forward with that charge.  Young further

17  testified that on March 10, 2008, the AUSA told him that a § 1542

18  violation would need to be prosecuted in Los Angeles, the place

19  where the passport application was submitted.  Young Decl. ¶ 10.

20  At that time, Young referred the case to the Los Angeles DSS

21  Office, specifically to Special Agent Paul Montuori.  Id.[4]

22     Paul Montuori testified that, after the case was referred to

23  him by Young, he went to Fresno to interview Mandie Abels, who was

24  present during the 1998 search and seizure at Hack's residence.

25  Montuori testified that, when Abels suggested he talk to Hack,

26

27       [4]Hack's primary argument rests on attacking the veracity of
   the government's witnesses on the timing of the federal
28  investigation.

1  Montuori gave Abels his card and told her to have Hack contact him.

2  Hack left a message on Montuori's voicemail while Montuori was

3  driving back to Los Angeles from Fresno.  On that message, Hack

4  said the following:

5      Paul this is Ross Hack, um you talked to Mandie today about
       uh, about my passport being taken, you know and actually there
6      is something even more interesting about that, which if you
       can recall because I had another passport taken, probably by
7      them again, because they were in my house, uh, investigating
       my sister for a parole violation and uh, you know I'm sure
8      they took that too.  You know, anyway and I leave tomorrow,
       you know, this is killing me.
9

10  Call 1.  When Montuori called Hack back, he apparently told Hack

11  that Hack could come down to the DSS office in Los Angeles and they

12  could issue one.  Hack had plans to leave for Europe the next day,

13  and eventually decided to fly to Los Angeles.

14      Hack arrived at the DSS office in Los Angeles on March 12,

15  2008.  At the DSS office, Hack made two statements: one about the

16  seizure of his passport in 1998, see Opp. Ex. A, and one about his

17  missing passport after the parole search in 2008.  After making

18  these statements, Hack was arrested.  The criminal complaint was

19  also filed on March 12, 2008.  The Indictment was filed on March

20  21, 2008.  The First Superseding Indictment was filed on June 24,

21  2008.

22      On March 14, 2008, at his pre-indictment arraignment, Hack was

23  ordered to permanent detention.  See Docket Entry Nos. 5-7, 9.  On

24  March 18, 2008, Hack filed an Application for Review/

25  Reconsideration of the March 14, 2008 order.  Bond and conditions

26  of release were set on March 19, 2008.  On March 21, 2008, DSS

27  Special Agent Young submitted a request for revocation of

28  defendant's 1998 passport and also requested that defendant's

9

passport be placed on lookout, "informing Customs and Border Patrol that defendant possessed a fraudulent passport that was invalid and should be detained if he attempted to use it." Young Decl. ¶¶ 11-12. This lookout was entered on March 24, 2008. A post-indictment arraignment was held on March 31, 2008.

**II.  DISCUSSION**

Hack seeks to suppress two types of documents. First, Hack argues that law enforcement officers went beyond the legal scope of their February 7, 2008 parole search and that they illegally seized his replacement passport during the course of that search. Second, Hack argues that the 1998 passport records were the fruit of this illegal seizure, and therefore must be suppressed. As § 1542 does not require the replacement passport, the heart of Hack's motion is the suppression of the application documents; however, his theory relies on the illegal seizure of the replacement passport.

**A.  Search of the House and Alleged Seizure of the Replacement Passport**

First, Hack argues that his replacement passport should be suppressed because the February 2008 search of Hack's bedroom and alleged seizure of his passport at that time exceeded the scope of the law enforcement agents' authority to conduct a parole search fo Melissa Hack and her belongings. The Government contends that there was no seizure of his replacement passport during the February 7, 2008 search, and that it is not in possession of Hack's replacement passport.

The parties do not dispute that law enforcement's presence in the Hack residence on February 7, 2008 was in connection with a parole search for Melissa Hack, and that there was no warrant to

search the Defendant's belongings.  Likewise, the parties appear to agree on the law that governs that parole search.  Where parole and probation searches are concerned, a parolee's reasonable expectation of privacy is determined by the terms and conditions of his or her parole.  Samson v. California, 547 U.S. 843, 850-52 (2006).  Whether a particular parole search is reasonable is determined by examining the totality of the circumstances.  United States v. Knights, 534 U.S. 112, 121 (1996).  The reasonableness of the scope of a probation search is a mixed question of law and fact.  United States v. Davis, 932 F.2d 752, 756 (9th Cir. 1991). At the very least, an officer must have a reasonable suspicion that the thing or place searched is within the ownership, possession, or control, of the individual.  Id. at 758-59.  The United States does not contest Hack's argument that (1) the officers conducting the parole search of Melissa Hack would not have been legally authorized to enter Hack's room during that search and (2) seizing his passport during that search would have been illegal.

This motion presents two competing factual theories.  The Government argues that Hack has not shown that any officer took his passport, and the Government believes Hack still has his passport. The Government's witnesses have uniformly testified that they were unaware of any seizure of Hack's passport on February 7, 2008. Additionally, the Government witnesses uniformly testified that they saw no officer enter Hack's room, except to accompany him to retrieve his sandals and shirt.  Rather, the Government contends that there was a concurrent federal investigation into Hack and that the 1998 passport application documents were discovered in

1  connection with the federal side of the investigation.[5]  The

2  Government questions whether Hack in fact still has his passport.

3  The Government points to Hack's representation that, despite

4  testifying that he discovered early on that the passport had been

5  taken, he did not: (1) attempt to obtain a new passport until March

6  12, 2008, the day before he was scheduled to leave for Europe (and

7  only after he was told to call Agent Montuori) or (2) call

8  Detective Merrick to complain that police had taken his passport.

9       Hack does not argue that any person – including his sister or

10  mother – saw an officer take Hack's passport.  Rather, Hack argues

11  that circumstantial evidence strongly suggests that the passport

12  was indeed taken during the search.  First, Hack himself testified

13  that he knew that he had the passport before the search and it was

14  gone after the search.  Second, Hack points to the testimony of his

15  mother, who testified by declaration that she saw "members of the

16  search team enter, remain in and then . . . exit Ross Hack's

17  bedroom multiple times."  J. Hack Decl. ¶ 6.[6]  Third, Hack notes

18  that his actions on March 12, 2008 in contacting Agent Montuori and

19  submitting the sworn statement about the February 7, 2008 parole

20  search were consistent with his testimony that he did not have the

21  passport and intended to get a new one.  Finally, and more broadly,

22

23       [5]The Government witnesses also uniformly testified that no
24  federal officers were present at the search.  Hack did not directly
     contest this assertion, but emphasized that most of the individuals
25  present at the search refused to identify themselves and were
     dressed in plain clothes.  Because he insisted, he received a card
26  from Detective Merrick of the Las Vegas Police Department.

27       [6]Hack also initially submitted the declaration of his sister,
     Melissa Hack, in support of his Motion to Suppress.  The Court
28  struck this declaration when Melissa Hack declined to subject
     herself to cross-examination on Fifth Amendment grounds.

1  Hack argues that the familiarity of the police with Hack supports
2  his theory because the police would have been motivated to find
3  anything they could on him.  In fact, Hack argues, the parole
4  search of Melissa Hack was merely a pretext for finding out
5  information on Ross Hack.

6      In light of the evidence, the parties' conflicting theories
7  about whether the passport was in fact seized on February 7 by Las
8  Vegas law enforcement leave at least some uncertainty as to the
9  exact course of events.  Multiple Government witnesses testified
10 that they did not know of any passport that was taken; indeed, some
11 testified that they were unaware that Hack had a passport.  Hack's
12 testimony and declarations contained some inconsistencies as to
13 when exactly he discovered the passport was missing and where it
14 was located.  Hack's actions on March 12, 2008 support an inference
15 in either direction.  Additionally, the federal and state interest
16 in Hack prior to the parole search may support Hack's theory
17 (though it also supports the Government's theory that it discovered
18 the passport documents independently).[7]  FBI Special Agent Kelly
19 identified Hack's potential flight as a particular concern: Agent
20 Kelly was in communication with the U.S. Attorney's Office
21 regarding authority to arrest Hack for passport fraud because he
22 was considered a flight risk.  Kelly Decl. ¶ 10.  Agent Kelly was
23 in contact with at least one LVMPD detective who would be at the
24 parole search, though neither he nor any other federal agent was at

25

26      [7]The Court is not persuaded by Hack's suggestion that Melissa
27 Hack was of no interest to law enforcement and the parole search
   was entirely pretextual.  The Government's witnesses have testified
28 as to why Melissa Hack was of interest, and there has been no
   testimony contradicting those representations.

1   the search.  The Court does not find Hack's argument regarding the

2   posting of bond persuasive.

3        The Government has repeatedly represented that it does not

4   have Hack's replacement passport; there is therefore no passport to

5   suppress.  With respect to whether the replacement passport was

6   illegally seized, while the Court is not inclined to find that the

7   circumstantial evidence undermines the sworn testimony of multiple

8   law enforcement officers, the Court does not consider Hack's

9   suggestion that Las Vegas law enforcement may have taken his

10  passport during the February 7 parole search to be entirely

11  implausible.  Because of the Court's finding below, however, the

12  Court ultimately need not decide whether the replacement passport

13  was actually seized.

14        B.   Passport Application Documents

15       Second, Hack argues that DSS obtained the passport application

16  documents as a result of the illegal passport seizure and therefore

17  the application documents must be suppressed as fruit of the

18  poisonous tree.  Because the government need not use any seized

19  passport to prove the crime at issue here, see U.S. v. Suarez-

20  Rosario, 237 F.3d 1164, 1167 (9th Cir. 2001) ("[T]he crime is

21  complete when one makes a statement one knows is true to procure a

22  passport." (internal quotation marks omitted)), the suppression of

23  the passport application documents is the heart of Hack's motion to

24  dismiss.  The Government contends (in the alternative) that DSS

25  obtained the passport application forms independent of any alleged

26  seizure, that it would have inevitably discovered their existence

27  because of the ongoing investigation, and that their discovery was

28  too attenuated any the seizure by local officers.  If the Court had

14

found above that there was no illegal seizure, the fruit of the poisonous tree doctrine would be inapplicable.  The Court finds that the passport application documents were not discovered as a result of the seizure, but rather through an independent source. Accordingly, even if the Court were to find that Hack's passport was illegally seized by Las Vegas law enforcement, suppression of the passport application documents would be inappropriate.  The Court does not address the Government's other theories.

As a general rule, where evidence is obtained as a result of an illegal search or seizure, that evidence must be excluded as "fruit of the poisonous tree."  See Murray v. U.S., 487 U.S. 533, 536-37 (1988) ("Beyond [tangible materials seized unlawfully and testimony concerning knowledge acquired during an unlawful search], the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." (internal quotation marks omitted)); United States v. Washington, 490 F.3d 765, 774 (9th Cir. 2004).  To determine whether evidence is derivative "fruit" that must be suppressed, courts often analyze how attenuated the discovery of the evidence was to the "poisonous" constitutional violation.  See Murray, 487 U.S. at 537; United States v. Washington, 387 F.3d 1060, 1072-73 (9th Cir. 2004).

Even where there was a constitutional violation, evidence will not be considered tainted "fruit" when it falls under the "independent source" doctrine.  The independent source exception

1  "allows admission of evidence that is actually found by legal means

2  through sources unrelated to the [illegal] search." U.S. v.

3  $493,850.00 in U.S. Currency, 518 F.3d 1159, 1165 (9th Cir. 2008);

4  see also U.S. v. Ankeny, 502 F.3d 829, 835 n.2 (9th Cir. 2007) (the

5  independent source doctrine "provides that evidence discovered by

6  independent legal means should not be suppressed even though there

7  was an illegal search as well").  For example, "where an unlawful

8  entry has given investigators knowledge of facts x and y, but fact

9  z has been learned by other means, fact z can be said to be

10 admissible because derived from an independent source." Murray,

11 487 U.S. at 538.

12     The Government asserts that it was concurrently investigating

13 Hack and that, in the course of that concurrent investigation, it

14 discovered the passport application documents.  FBI Special Agent

15 Kelly testified that, as part of his JTTF duties, he and the LVMPD

16 were investigating Hack's re-emergence onto the Las Vegas white

17 supremacist scene.  At the evidentiary hearing, Kelly testified

18 that he had heard of Ross Hack at some point during 2007, but that,

19 prior to January 2008, he believed that Ross Hack was still

20 overseas.  Kelly also testified that he had not heard about the

21 1998 search of Ross Hack's house until after the investigation of

22 the Unity Fest incident was underway.

23     Kelly testified that in mid-January, he learned that the

24 Hammerskins were planning a Unity Fest concert to be held on

25 January 26, 2008 and met with LVMPD detectives to coordinate

26 investigation into the event.  Kelly Decl. ¶ 6.  His investigation

27 led him to believe that Melissa Hack was an organizer of the event.

28 Id.  Kelly testified that on February 1, 2008, he met with LVMPD

1   detectives who participated in surveillance of Unity Fest to share
2   information.  Id. ¶ 7.  Kelly further testified that he discussed
3   the re-emergence of Hack on the Hammerskin scene with LVMPD
4   detectives at the February 1 meeting.  Id.  On February 6, 2008,
5   Kelly attended another meeting with LVMPD detectives and Parole &
6   Probation, where they discussed executing a parole search on
7   Melissa Hack.  Id. ¶ 8.  According to Kelly, on the morning of
8   February 7, 2008, he contacted his JTTF colleague, DSS Special
9   Agent John Young and requested a records check on the date the
10  defendant returned to the United States.  Id. ¶ 9.  At the
11  evidentiary hearing, Young testified that he had not heard of Ross
12  Hack prior to this request, and Kelly testified at the hearing that
13  he had not brought Young into the case until that time.  Young and
14  Kelly testified that the 1998 passport applications were discovered
15  during this investigation.  Young testified that he saved the
16  passport applications to his computer.  He makes a practice of
17  doing this when it appears that the matter will be part of a case.
18  His computer shows a "modified date" for the 1998 passport
19  application of February 7, 2008 at 9:36:16 AM.[8]  It is undisputed
20  that the parole search took place in the afternoon.
21      Kelly also testified that, after discovering the 1998 passport
22  application documents, he called Detective Merrick of the LVMPD to
23  inform him that Kelly believed Hack had committed passport fraud.
24  Kelly Decl. ¶ 10.  Kelly testified that he was aware that the
25  parole search of the Hack residence was scheduled for later that
26  day.  Id.  He then contacted the Assistant United States Attorney
27
28      [8]Agent Kelly testified that he does not have access to Young's
    computer because it is a Department of State computer.

1    in Las Vegas for a legal opinion as to whether there was probable
2    cause to arrest Hack at the time of the parole search because he
3    considered Hack a flight risk.  Id.  The AUSA wanted to investigate
4    the case further and did not authorize Hack's arrest at that time.
5    Id.
6         Hack's attack on the Government's chronology relies on (1) the
7    accusation that Young and Kelly were committing perjury when
8    submitting their declarations and testifying in person[9] and (2)
9    inferences from circumstantial evidence.  First, Hack emphasizes
10   what he characterizes as a lack of corroboration as to the timing
11   of the investigation – and, in particular, a lack of corroboration
12   as to when DSS Agent Young first viewed the passport applications.
13   At oral argument, Hack suggested that Young could have changed the
14   time and date settings on his computer.  Hack also noted that FBI
15   Agent Kelly apparently does not have a specific record
16   memorializing the conversation he had with Agent Young or with the
17   Las Vegas AUSA.  To lend additional support to his contention that
18   the federal agents were giving perjured testimony as to the timing
19   of the federal investigation, Hack points to circumstantial
20   evidence.  Hack questions the timing of the referral to Los
21   Angeles; in particular, he suggests that it should not have taken
22   over a month to determine that this case needed to be prosecuted in
23

24        [9]At oral argument, Hack argued that his theory did not require
25   that the federal agents conspired with the LVMPD to seize Hack's
     passport.  It could be, Hack argued, that LVMPD officers seized
26   Hack's passport and then asked the federal agents to investigate
     without the federal agents knowing that the passport had been
27   seized.  While this theory may not require an initial collusion
     between the LVMPD and federal officers, it does require that at
28   least two federal agents lied under oath in support of the
     Government's opposition to this Motion.

1  Los Angeles, where the application for the replacement passport was

2  submitted.  (Hack also relies on the evidence and arguments

3  described above with respect to the seizure of the passport.)

4       Even if law enforcement present at the Hack residence during

5  the parole search in fact seized Hack's passport, the Court finds

6  credible the testimony from DSS Agent Young and FBI Agent Kelly as

7  to the chronological course of the federal investigation.  Hack has

8  presented no evidence undermining the assertion fact that the

9  investigation into Hack was ongoing prior to February 7, 2008.[10]

10 While the federal agents arguably could have kept or presented more

11 detailed records, nothing in either agent's testimony on cross-

12 examination undermined the veracity of his representations as to

13 when the investigation took place.

14      The Court is not persuaded that either of the two issues Hack

15 raises calls the agents' testimony into question.  Hack appears to

16 suggest that the timing of the application download is suspiciously

17 convenient in that it purportedly occurred just hours before the

18 parole search.  The Court does not find that timing problematic.

19 There has been no challenge to the representation that the Unity

20 Fest concert took place on January 26, 2008.  Agent Kelly testified

21 that there were meetings on February 1 and 6 with LVMPD, and that

22 the parole search was discussed at the February 6 meeting.  Kelly

23 Decl. ¶¶ 7-8.  Kelly also testified that he considered Hack a

24 flight risk.  Id. ¶ 10.  LVMPD Detective Merrick testified at the

25 evidentiary hearing that he had learned during the course of an

26

27      [10]In fact, as noted above, Hack's theory as to why law

28 enforcement might have wanted to seize his passport draws at least
   some circumstantial support from that chronology.

1  investigation that Hack was planning to leave the area.  In light
2  of the narrative of the investigation provided by Agent Kelly, the
3  Court does not find the timing suspicious: it is plausible that,
4  after the meeting with LVMPD on February 6, the investigation into
5  Hack would proceed quickly.  Hack has not presented evidence that
6  suggests otherwise.  Hack also suggests that the one-month delay
7  between February 7, 2008, when the agents discovered the alleged
8  fraud, and March 10, 2008, when the AUSA advised Agent Young that
9  the case needed to be prosecuted in Los Angeles, is suspiciously
10 long for the apparent course of events.  The Court does not
11 consider that delay suspicious.  Agent Young explained during
12 cross-examination at the evidentiary hearing that, during that one-
13 month period, he and the AUSA were exploring different potential
14 charges related to passport fraud, and that part of that
15 investigation required interviewing Mandie Abels.  While the one-
16 month delay may also be consistent with Hack's proposed version of
17 events, it does not cast doubt on the veracity of Agent Young's or
18 Agent Kelly's testimony.

19       Overall, the Court finds the Government's chronology as to the
20 federal investigation credible.  Agents Kelly and Young discussed
21 Hack's presence in the United States and discovered his passport
22 application documents prior to the parole search, which
23 indisputably occurred on the afternoon of February 7.  Based on
24 that chronology, there was no causal link between the alleged
25 seizure of the replacement passport and the discovery of the
26 passport applications.  See $493,850.00 in U.S. Currency, 518 F.3d
27 at 1165 ("The information at issue here is not a fruit of the
28 poisonous tree because it was not discovered subsequent to the

1  illegal seizure . . . nor was it derived in any way from the

2  illegal seizure[.] . . . The information was learned from

3  preexisting, unrelated investigations."). Accordingly, even if the

4  LVMPD seized Hack's passport, the passport application documents

5  had an independent source, and the Motion to Suppress must be

6  denied.[11]

7  **III. CONCLUSION**

8      For the foregoing reasons, the Court denies Hack's Motion to

9  Suppress in full.

10  IT IS SO ORDERED.

11

12

13  Dated: March 4, 2009

14                                         DEAN D. PREGERSON
                                           United States District Judge

15

16

17

18

19

20

21

22

23

24

25  _____

26      [11]Relatedly, the timing of the federal investigation into
    Hack's involvement in the Unity Fest incident – which had begun by
27  February 1, according to Agent Kelly, see Kelly Decl. ¶ 7 –
    suggests that the "inevitable discovery" exception would also
28  apply.  See U.S. v. Ramirez-Sandoval, 872 F.2d 1392, 1399 (9th Cir.
    1989).

21